UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GLENN A. PRATT,

                                    Plaintiff,

              -v-

ATALIAN GLOBAL SERVICES INC.,
ATALIAN US NEW ENGLAND, LLC,
and LA FINANCIERE ATALIAN S.A.S.,

                                    Defendants.

---

20 Civ. 3710 (PAE)

OPINION &
ORDER

PAUL A. ENGELMAYER, District Judge:

        This case involves a dispute over money held in an escrow account created in connection

with a corporate acquisition.  Until 2017, plaintiff Glenn A. Pratt was the owner of six

companies that provided janitorial and cleaning services in the Northeast and the Midwest

(together, the "Suburban Companies" or "Suburban").  In December 2017, defendant Atalian US

New England, LLC ("Atalian NE") purchased the Suburban Companies through a share

purchase agreement ("SPA").  Atalian NE's corporate parents, Atalian Global Services Inc.

("Atalian Global") and La Financiere Atalian S.A.S. ("La Financiere," and, together with Atalian

Global, the "Guarantors"), guaranteed the SPA.  At the time of the acquisition, $2.1 million of the

$21 million purchase price was set aside in an escrow account to cover, *inter alia*,

indemnification claims in the event that Atalian NE suffered an indemnifiable loss.  To obtain

indemnification, Atalian NE was required to provide an indemnification notice, as described in

the SPA, to Pratt within two years of the SPA's effective date.  Otherwise, the parties were to

jointly instruct the escrow agent to release the escrowed funds to Pratt.

In December 2019, days before its deadline to do so, Atalian NE notified Pratt that it had suffered indemnifiable losses exceeding the escrowed amount, which it claimed had been caused by Pratt's breaches of certain representations and warranties made in the SPA.  The same day, Atalian NE wrote the escrow agent, directing that the escrowed funds not be distributed pending resolution of Atalian NE's indemnification claims.

In this diversity action, Pratt claims that Atalian NE's indemnification notice failed to comply with the SPA, makes baseless claims for indemnification, and has wrongly prevented Pratt from realizing the full amount of the sale of the Suburban Companies.  He brings claims for breach of contract and for a declaratory judgment.  He seeks, *inter alia*, an order directing the escrow agent to release the escrowed funds to him.

Defendants move to dismiss Pratt's claims in their entirety.  All argue that Pratt's complaint fails to state a claim for breach of contract or for a declaratory judgment.  The Guarantors also contend that Pratt lacks standing to sue them because they are not parties to the separate escrow agreement and cannot direct the escrow agent to release funds.  Finally, La Financiere argues that the Court lacks personal jurisdiction over it and that Pratt's claims against it are precluded by New York Business Corporation Law ("BCL") § 1314(b).

For the reasons that follow, the Court grants each motion in part and denies each motion in part.  The Court grants Atalian NE's motion as to Pratt's claim for breach of the SPA and Escrow Agreement.  The Court also grants the Guarantors' motion in part and dismisses La Financiere from this action pursuant to BCL § 1314(b).  The Court, however, denies the motions to dismiss Pratt's claim for declaratory relief and the claim against Atalian Global, as guarantor of all Atalian NE's obligations under the SPA.

I.      **Background**

      A.      **Factual Background**[1]

            1.      **Parties**

Plaintiff Glenn A. Pratt is an individual and resident of Cohasset, Massachusetts.  Before December 2017, he owned the Suburban Companies.  Compl. ¶¶ 10, 19, 25.[2]

Defendant Atalian Global is a Delaware corporation with its principal place of business in New York.  *Id.* ¶ 11.  It is the American division of its French parent, La Financiere.  *Id.* ¶ 21. In recent years, Atalian Global has expanded its presence in the United States by purchasing facilities-management companies, such as the Suburban Companies, which had succeeded in their local markets.  *Id.*

Defendant Atalian NE is a Delaware limited liability company with its principal place of business in New Jersey.  *Id.* ¶ 12.  Its sole member is Atalian Global.  *Id.*  On December 7, 2017, it entered into the SPA with Pratt and purchased the Suburban Companies.  *Id.* ¶ 25.[3]

---

[1] This account is drawn primarily from the factual allegations in the complaint, Dkt. 1 ("Compl."), which, for the purposes of resolving a motion to dismiss, the Court accepts as true, drawing all reasonable inferences in plaintiff's favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  Although the complaint does not attach the SPA, the escrow agreement, or Atalian NE's indemnification notice, the Court may, and does, draw on those documents because the complaint "'relies heavily upon [their] terms and effect,' thereby rendering the document[s] 'integral' to the complaint."  *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

[2] Those were: (1) Suburban Contract Cleaning, Inc.; (2) Suburban Building Services Group, Inc.; (3) Omni Building Services - Ohio Inc.; (4) Suburban Contract Cleaning Services of Pennsylvania, Inc.; (5) Braintree Building Services of Rhode Island, Inc.; and (6) Suburban Mechanical Services, Inc.  Compl. ¶ 19.

[3] The complaint alleges that Atalian NE is the "successor company" to AGS-Suburban LLC, which is the entity named in the SPA as the purchaser of the Suburban Companies, and that AGS-Suburban LLC "merged into" Atalian NE in January 2020.  Compl. ¶ 12.  Atalian NE states that this is not technically correct, as AGS-Suburban LLC instead merely changed its name to Atalian US New England, LLC, in December 2019.  Dkt. 24 ("Atalian NE Mem.") at 2 n.3.  In any event, the parties agree that Atalian NE is the purchasing entity under the SPA.  *Id.*

Defendant La Financiere is a French joint stock company with its principal place of business in France.  *Id.* ¶ 13.  Its owners are also foreign residents.  *Id.*

### 2.    Atalian NE's Acquisition of the Suburban Companies

Atalian approached Pratt with an interest in buying the Suburban Companies, so as to access their valuable contracts and markets in the Northeast and Midwest.  *Id.* ¶ 22.  After conducting substantial due diligence, Atalian NE agreed to do so.  *Id.* ¶¶ 23–24.  On December 7, 2017, the parties closed the transaction, and Pratt sold the Suburban Companies to Atalian NE for $21 million.  *Id.* ¶¶ 25–26.  As a condition of the sale, 10% of that purchase price, or $2.1 million, was placed in an escrow account.  *Id.* ¶ 26.

### 3.    The SPA and Escrow Agreement

Two documents executed in connection with that sale are central to this dispute, which involves the proper distribution of the $2.1 million set aside the above-mentioned escrow account.  These are: (1) the SPA, *see* Dkt. 24-1 ("SPA"); and (2) the Escrow Agreement, Dkt. 24-2 ("Escrow Agreement" or "EA").

#### a.    The SPA

In the SPA, Pratt made a number of representations and warranties.  *See generally* SPA art. V ("Representations and Warranties of the Seller").  As relevant here, those included representations as to: each company's organization and power, *id.* § 5.1(b); each company's capitalization, *id.* § 5.4; the accuracy of disclosed financial statements and accounts receivable, *id.* § 5.5; other agreements and contracts to which each company was a party, *id.* § 5.12; each company's compliance with applicable labor and employment laws and agreements, *id.* § 5.15; each company's transactions with any affiliates of Pratt or any company's officers, directors, managers, or owners, *id.* § 5.19; and, more generally, each company's compliance with all applicable laws, *id.* § 5.21.

4

The SPA also contained a number of indemnification provisions.  Relevant here, Pratt agreed to indemnify Atalian against "any Loss which any such Purchaser Indemnitee may suffer, sustain, or become subject to, as a result of or relating to: (i) the breach of, or inaccuracy in, any representation or warranty made by the Seller contained in this Agreement" or "[f]raud by the Seller."  *Id.* § 8.2(a)(i), (xii).  "Loss" was defined to mean "any liability, demand, claim, action, cause of action, cost, damage, deficiency, Tax, penalty, fine, or other loss or expense, whether or not arising out of a third party claim, including all interest, penalties, reasonable attorneys' fees and expenses and all amounts paid or incurred in connection with any Proceeding."  *Id.* at 5.  In most cases, neither party could recover for any loss "unless written notice of a claim in respect thereof is delivered to the other Party no later than the Applicable Limitation Date," which is "twenty-four (24) months after the Closing Date," *i.e.*, December 7, 2019.  *Id.* § 8.1.  For losses arising from breaches of any "Fundamental Representations and Warranties," however—which include those under sections 5.1 and 5.19 of the SPA—there is no limitation date.  *Id.* § 8.1(b).  Similarly, although Pratt's aggregate liability for indemnification was generally capped at $2.1 million (*i.e.*, the escrow amount), *id.* at 2, that cap did not apply to losses resulting from any breach of any Fundamental Representations and Warranties or fraud, *id.* § 8.1(b).

The SPA further set forth procedures by which a party was to pursue these indemnification rights.  To do so, the SPA requires, *inter alia*, that an indemnified party

> shall as promptly as reasonably possible give written notice (an "Indemnification Notice") to the other Party (the "Indemnifying Party") after receiving written notice of any Proceeding against it (if by a third party) or discovering the liability, obligation, or facts giving rise to such claim for indemnification, describing the claim, the amount thereof (if known and quantifiable), and the basis thereof; *provided* that the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its obligations hereunder except to the extent such failure shall have materially prejudiced the Indemnifying Party.

*Id.* § 8.2(g)(i).  In addition, in the event of an indemnification claim:

5

> Each Party shall, and shall cause each affiliated Indemnified Party to, make available to the Indemnifying Party and its representatives all books and records of the Indemnified Party reasonably relating to any Loss and shall render to the Indemnifying Party such assistance and access to records and the representatives of such Indemnified Party as the Indemnifying Party and its representatives may reasonably request, except that no Indemnified Party shall be required to make available to the Indemnifying Party and its representatives any books, records, documents or other information that the Indemnified Party reasonably determines to be confidential or subject to attorney-client privilege unless and until the Indemnifying Party and its representatives shall have entered into such agreements as the Indemnified Party reasonably deems to be necessary in light of all surrounding circumstances (including, without limitation, the Indemnifying Party's need for information in connection with the investigation or defense of a Loss) to protect such confidentiality or privilege.

*Id.* § 8.2(g)(v).

In addition, the SPA's indemnification provision contained a section relating to the escrow fund.  Any indemnification payment was to "first be paid by release of funds to such Purchaser Indemnitee from the Escrow Account."  *Id.* § 8.2(j)(i).  If the indemnification amount exceeded the escrow amount, then the indemnified party was able to seek the excess amount directly from the indemnifying party.  *Id.*  Within 10 days of the second anniversary of the parties' closing date (*i.e.*, December 7, 2019), Atalian NE and Pratt were to

> execute and deliver to the Escrow Agent a Joint Instruction Letter instructing the Escrow Agent to release all or a portion of the funds remaining in the Escrow Account to the Seller such that, following such release, the amount remaining of the Escrow Account, if any, equals the amount of Purchaser Indemnification Claims asserted in an Indemnification Notice prior to such second anniversary but not yet resolved (such unresolved claims, the "Unresolved Indemnification Claims") and thereafter, to the extent applicable, the funds in the Escrow Account retained for Unresolved Indemnification Claims shall be released from time to time on a claim-by-claim basis by the Escrow Agent upon the receipt of a Joint Instruction Letter or Final Order (as defined in the Escrow Agreement) in respect of any such Unresolved Indemnification Claim.

*Id.* § 8.2(j)(iii).  In other words, after two years and 10 days, Pratt became entitled to a joint order directing the escrow agent to release any escrow amount that exceeded the amount of unresolved losses to which Atalian NE claimed an entitlement to indemnification.

Last (as relevant here), Atalian Global and La Financiere "irrevocably, absolutely and unconditionally" guaranteed Atalian NE's obligations under the SPA, including prompt payment and performance by Atalian NE and "any damages payable to [Pratt] pursuant to the terms of this Agreement." *Id.* § 9.1(a). The SPA specified that the Guarantors were parties to the agreement "solely for purposes of Section 9.1 hereof." *Id.* at 1 (emphasis omitted). Section 9.1(d), in turn, stated that "for all purposes of the Atalian Guaranty, the provisions of Section 10.10 and 10.12 shall be binding upon [the guarantors] and shall apply to [them] as fully and effectively as if [they] were a named party to this Agreement." And section 10.10, entitled "Submission to Jurisdiction; Choice of Forum," provided that "except as otherwise provided herein, any legal suit, action or proceeding arising out of or based upon this agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America . . . in each case located in the City of New York and County of New York," and that "each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding."

### b.    *The Escrow Agreement*

The parties signed a separate Escrow Agreement concurrently with the SPA. *See* Compl. ¶ 26. The Escrow Agreement required the escrow agent to disburse funds upon instruction to do so, either in the form of a "Joint Instruction Letter" from Pratt and Atalian NE or a "Final Order," which means "a final and nonappealable order of a court of competent jurisdiction." EA §§ 1, 4(a). The Escrow Agreement, however, did not contain any provisions for resolving indemnification claims. It specified only that, in the event of a dispute over the disbursement of escrowed funds, such dispute "shall be resolved pursuant to the dispute resolution procedures set forth in the [SPA]," the results of which should be delivered to the escrow agent in any subsequent Joint Instruction Letter. *Id.* § 6.

### 4.     Atalian NE's Indemnification Notice

On December 4, 2017—three days before the expiration of the time for Atalian NE to make a claim for indemnification—Atalian NE sent Pratt a letter, "which purported to be an Indemnification Notice."  Compl. ¶ 31; *see* Dkt. 24-3 ("Notice").  In it, Atalian NE alleged that Pratt had violated each of the above-described warranties and representations in section 5 of the SPA.  Compl. ¶ 31.  It further alleged that Atalian NE had "incurred investigative costs (including legal fees) and losses related to the Claims in excess of the amount held under the Escrow Agreement; that is, over $2.1 million."  Notice at 1.  The same day, Atalian NE sent the escrow agent a letter informing the agent of the indemnification claims.  Compl. ¶ 32.

Specifically, the Notice described the following three claims.  As alleged by Atalian NE, each reflected breaches by Pratt of all the above-mentioned representations and warranties, and each resulted in losses exceeding $2.1 million.

### a.     The Taj Claims

First, Atalian NE alleged that Pratt "failed to disclose to [Atalian NE] that Suburban was operating, controlling and de facto owned an affiliated company known as Taj Contract Cleaning Inc., as well as any related entities ('Taj')."  Notice at 2.  The Notice claimed that Taj, which almost exclusively subcontracted with one of the Suburban Companies, was solely owned by Dan Persaud, the brother of one of Suburban's managers, Roger Persaud.  *Id.*  It further alleged that Suburban operated and controlled Taj, including by handling essentially all of Taj's employment functions, such as overhead, payment, and management.  *Id.*  According to the Notice, Atalian NE learned that, at the time of the SPA's execution, Pratt was aware that there was "no distinction between Suburban and Taj," and that Taj in fact paid a "substantial salary" to Suburban employees for the services they rendered to Taj, but failed to disclose these facts to Atalian NE.  *Id.*

8

The Notice alleged that Pratt's failure to disclose the relationship between Taj and Suburban violated the representations and warranties in sections 5.1, 5.4, 5.5, 5.12, 5.19, and 5.21 of the SPA.  *Id.*  It claimed indemnification for losses arising from those breaches.  *Id.*  It further maintained that the misrepresentations "were intentionally made with the intent to deceive," and therefore sought indemnification under section 8.2(a)(xii) of the SPA, relating to fraud.  *Id.*  The Notice claimed losses arising from (1) "off the books" salaries paid by Taj to Suburban officers and managers; (2) costs associated with Taj that were not declared by Pratt at the time of the SPA; (3) any future damages or liability to third parties arising from what the Notice described as "undisclosed affiliate transactions"; and (4) investigation costs and legal fees relating to Taj.  *Id.* at 3.  Altogether, the Notice estimated, as a "non-binding preliminary estimate," Atalian NE's damages to be "in excess of $2.1 million."  As discussed further below, Pratt's complaint alleges that this claim for indemnification was baseless.  Compl. ¶¶ 41–47.

### b.    Violations of the Collective Bargaining Agreement

Second, Atalian NE alleged in the Notice that the Suburban Companies had engaged in a scheme to avoid their obligations under a collective bargaining agreement (the "CBA") with the Service Employees National Union, Local 32BJ.  Notice at 3.  Without much detail, the Notice states that Suburban "conspired to avoid its obligations under the CBA," with the goal of "avoid[ing] paying union dues and benefits in order to increase Suburban's profits."  *Id.*  The Notice claimed breaches of the same representations and warranties as it did in connection with the Taj allegations.  *Id.*  As to damages, the Notice stated that Atalian NE was "still investigating these claims and at this time, it cannot quantify all of the losses incurred," but that it may incur losses with respect to years' worth of CBA violations.  *Id.* at 4.  Nevertheless, it provided a "non-binding preliminary estimate" that its losses as to this claim, too, likely exceeded $2.1 million.  *Id.*  Pratt's complaint does not refer to these allegations.

9

c.       *Ghost Employees*

Third, Atalian NE alleged that Suburban engaged in a scheme to pay "ghost employees" in order to, "among other things, avoid union obligations and to increase its profits." *Id.* According to the Notice, Suburban fabricated payroll documents and caused checks to be issued in the names of former employees and other persons who did not work for Suburban. *Id.* Such checks, the Notice claimed, were then "cashed by different area supervisors at the direction of Suburban management" at varied locations, to avoid suspicion for the scheme. *Id.* The cash allegedly then went to "Suburban supervisors and managers," including one "senior manager over a prolonged period of time." *Id.* The Notice stated that these practices may have been a part of the alleged scheme, described above, to avoid union dues, or simply aimed to personally benefit some Suburban employees. *Id.* The Notice claimed that this scheme violated the same representations and warranties discussed above. *Id.* at 5. Although Atalian NE's investigation was still underway, it again provided a "non-binding preliminary estimate" that its damages arising from this "scheme" exceeded $2.1 million.

According to the complaint, in March 2020 Atalian NE sued Taj and Roger Persaud in the District of Rhode Island seeking damages relating to this "ghost employee" scheme. Compl. ¶ 47. There, Atalian NE asserted that it had first learned of that scheme in July 2019 and describes "ghost" payments from June to August 2019 in amounts exceeding $300,000. *Id.* However, Atalian NE's claims in that action do not mention or relate to Pratt, and do not seek damages approximating $2.1 million. *Id.* In his opposition to Atalian NE's motions to dismiss, Pratt asserts that the claim is "factually baseless." *See, e.g.*, Dkt. 31 ("Pratt Mem.") at 6–7.

More broadly, Pratt contends that "[t]he transparent purpose of the December 4th Letter was to tie up the Escrow Amount in an effort to prevent Mr. Pratt from realizing the full amount of the sale." Compl. ¶ 9.

###### 5.      The Parties' Subsequent Negotiations

On March 4, 2020, Pratt, through counsel, wrote to Atalian NE denying the allegations in the Notice and asking Atalian NE to release the escrow.  *Id.* ¶ 49.  He also requested, pursuant to section 8.2(g)(v) of the SPA, copies of the books and records supporting the indemnification claims.  *Id.*

On March 13, 2020, Atalian NE refused to send a Joint Instruction Letter allowing the disbursement of the escrow amount and declining to provide documentary support for its claims. *Id.* ¶ 51.  It stated that it would not provide the latter absent a confidentiality agreement.  *Id.*; *see* SPA § 8.2(g)(v) (no indemnified party need make such records available "unless and until the Indemnifying Party and its representatives shall have entered into such agreements as the Indemnified Party reasonably deems to be necessary in light of all surrounding circumstances"). Nonetheless, on March 16, 2020, three days later, Atalian NE filed the Rhode Island complaint bringing claims arising from the "ghost employee" scheme.  Compl. ¶¶ 47, 51.  The complaint in that action, Pratt alleges, "revealed much of the purportedly confidential information" that Atalian NE had refused to provide him.  *Id.* ¶ 51.

On April 1, 2020, after Pratt again requested Atalian NE's books and records relating to the Notice, Atalian NE provided him with a proposed confidentiality agreement.  *Id.* ¶¶ 52–53. But that agreement "was overly restrictive and unacceptable to Mr. Pratt."  *Id.* ¶ 54.  On April 9, 2020, Pratt sent a revised draft back to Atalian NE, which appears not to have accepted it.  *Id.* On April 22, 2020, Atalian NE provided Pratt with two publicly available documents, neither of which included the complaint from the Rhode Island action, and stated that "we cannot review every document you request in detail, and it would be unreasonable to expect us to do so."  *Id.*

After Pratt commenced the instant action, the parties agreed to a stipulated protective order, which the Court entered on September 14, 2020.  Dkt. 48.

11

### 6.   Pratt's Complaint

Pratt's Complaint alleges that Atalian NE breached the SPA "by wrongfully claiming that Mr. Pratt breached the warranties and representations set out in" the SPA, when in fact Atalian NE "has not suffered an indemnifiable loss."  Compl. ¶¶ 58–59.  It also alleges that Atalian NE breached the SPA by failing to comply with its indemnification procedures, including by failing to provide notice of Atalian NE's claims "as promptly as reasonably possible," in a manner that prejudiced Pratt, *id.* ¶¶ 60–61, and by failing to direct the escrow agent to disburse the escrowed funds to Pratt, *id.* ¶¶ 63–64.

The Complaint also alleges that Atalian NE breached the Escrow Agreement by failing to send a Joint Instruction Letter to the escrow agent and by "improperly asserting baseless claims for indemnification against Mr. Pratt with the purpose and effect of preventing the disbursement of the Escrow Amount."  *Id.* ¶¶ 68–69.

The Complaint further alleges that the Guarantors breached section 9.1 of the SPA by "failing to prevent the breaches by Atalian discussed above."  *Id.* ¶ 75.

As a result of those breaches, Pratt claims damages of, *inter alia*, the $2.1 million allegedly wrongly held in escrow, plus attorney's fees incurred in seeking to enforce his rights to those funds.  *Id.* ¶¶ 65, 70, 76.  Finally, Pratt seeks a declaration that Atalian NE must execute and deliver a Joint Instruction Letter to the escrow agent directing it to release the $2.1 million escrow amount to Pratt.  *Id.* ¶ 81.

### B.   Procedural History

On May 13, 2020, Pratt filed the Complaint.  On July 15, 2020, the defendants filed two motions to dismiss, Dkts. 22–23; a memorandum in support of Atalian NE's motion, Atalian NE Mem.; and a memorandum in support of the Guarantors' motion, Dkt. 26 ("Guarantors Mem.").

12

On July 24, 2020, the Court issued an order giving Pratt the option to either amend his complaint or oppose the motions to dismiss. Dkt. 30. On August 5, 2020, Pratt opposed the motions. Pratt Mem. On August 19, 2020, the defendants filed their replies. *See* Dkts. 36 ("Atalian NE Reply"), 38 ("Guarantors Reply").

On September 4, 2020, the Court held an initial pretrial conference, after which it entered a case management plan, Dkt. 46, and a stipulated protective order submitted by the parties, Dkt. 48.

## II.     Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *See Koch*, 699 F.3d at 145. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.     Discussion

### A.     Choice of Law

At the threshold, the Court must determine which state's law applies. For the most part, the parties agree, based on the SPA's and Escrow Agreement's choice-of-law provisions, that

Delaware law governs the interpretation of each contract. *See* Atalian NE Mem. at 12–14; Pratt Mem. at 8 & n.6. However, the Guarantors argue that New York law governs their motion to dismiss because the SPA provision containing their guarantee does not include its own choice-of-law term. *See* Guarantors Mem. at 7–8. Their premise is that section 10.9 (*i.e.*, the SPA's choice-of-law provision), to which they are not parties, does not apply to section 9.1. *See* SPA at 1 (SPA "made by and between" Pratt and Atalian NE, "and, solely for purposes of Section 9.1 hereof," the Guarantors). Depicting section 9.1 as a separate "Guaranty Agreement," the Guarantors contend that the Court must engage in an independent choice-of-law analysis, without regard to the SPA's choice-of-law provision, which results in the application of New York law to the claims against them. *See* Guarantors Mem. at 7–8.

That argument is unpersuasive. The text of section 10.9's choice-of-law provision announces its expansive scope:

> *All questions* concerning the construction, validity, and interpretation *of this Agreement* shall be governed by and construed in accordance with the domestic laws of the State of Delaware, without giving effect to any choice of law or conflicts of law principles (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

SPA § 10.9 (emphasis added). Section 9.1—to which the Guarantors are effectively parties— is indisputably part of the "Agreement" to which section 10.9 refers. *See* SPA § 1.1 (defining "Agreement" as "this Stock Purchase Agreement, including all Exhibits and Schedules hereto"); *id.* at 1 ("This Stock Purchase Agreement . . . is made by and between Glen A. Pratt . . . , and, solely for purposes of Section 9.1 hereof," the Guarantors). The Guarantors do not offer any basis for treating section 9.1 as a separate stand-alone "agreement" unaffected by the choice-of-law provision in section 10.9. *See* Guarantors Mem. at 7 (asserting only that "[t]he Guaranty Agreement does not contain a governing law clause"). Nor do they explain why the parties

would have included a clear choice-of-law provision as to the SPA as a whole, while leaving open whether a different state's law should apply solely to the Guarantors' obligations under section 9.1, or why any party would have wished different laws to apply to the guarantee versus the underlying obligation that the guarantee secured.

In any event, no party has articulated any difference between New York and Delaware law on this point. All appear to agree that the Guarantors' liability turns on the liability of Atalian NE under the SPA and the Escrow Agreement—which undisputedly is determined under Delaware law. *See* Guarantors Mem. at 9–10; Pratt Mem. at 8 n.6, 20; Guarantors Reply at 1. Absent an "actual conflict" between potentially applicable state laws, the Court need not definitively resolve which law might apply. *See, e.g.*, *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006). Accordingly, for purposes of the instant motions, the Court applies Delaware law to all of Pratt's claims.

**B.    Atalian NE's Motion to Dismiss**

**1.    Pratt's Claims Under the SPA**

Atalian NE moves to dismiss all Pratt's claims under the SPA for failure to state a claim upon which relief can be granted. It argues that its Notice complied with all relevant aspects of the SPA, that it did not breach any provision of the SPA by requiring a confidentiality agreement as a condition of producing its books and records or declining to send a Joint Instruction Letter, and that, under Delaware law, the assertion of a "meritless" or "baseless" indemnification does not give rise to a claim for breach of contract. It also argues that Pratt's claim for a declaratory judgment fails to state a claim. The Court first addresses Pratt's claim for declaratory relief—which the Court finds well pled—and then turns to his contract claims.

### a.  Declaratory Relief

Under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), a court "may declare the rights and other legal relations of any interested party seeking such a declaration" in "a case of actual controversy."  An "actual controversy" exists if there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).  The controversy between the parties must "have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them."  *Jenkins v. United States*, 386 F.3d 415, 418 (2d Cir. 2004) (quoting *Pub. Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 244 (1952)).  "Even where an actual controversy has been established, a court must still decide whether it will exercise its discretion to entertain a request for declaratory judgment."  *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 311 (S.D.N.Y. 2010).  The Declaratory Judgment Act thus "confers a discretion on the courts rather than an absolute right upon the litigant."  *Wycoff*, 344 U.S. at 241.

"In deciding whether to exercise its permissive jurisdiction, a district court may consider 'equitable, prudential, and policy arguments,'" *Cont'l Bldg. Prods. Operating Co., LLC v. Lafarge N. Am., Inc.*, No. 17 Civ. 2599 (AJN), 2018 WL 1583309, at *6 (S.D.N.Y. Mar. 27, 2018) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007)), and must examine the situation in its entirety, *Great Am. Ins. Co. v. Houston Gen. Ins. Co.*, 735 F. Supp. 581, 585 (S.D.N.Y. 1990).  A court also must consider "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty."  *Amusement Indus.*, 693 F. Supp. 2d at 311 (quoting *Duane Reade*, 411 F.3d at 389).

Here, Pratt pleads an actual controversy sufficient to state a claim for declaratory relief. He alleges, and Atalian NE's exhibits confirm, that Atalian NE has asserted indemnification claims against him in excess of $2.1 million. Compl. ¶ 6. Those claims arise from purported breaches on his part of specific provisions of the SPA, based on allegations about his conduct which the Notice sets out in detail. *See, e.g.*, *id.*; Notice at 2–5. Pratt alleges that Atalian NE's indemnification claims have resulted in the withholding from Pratt of $2.1 million to which he became entitled in December 2019. Compl. ¶ 78. Pratt further alleges that Atalian NE's indemnification claims are factually baseless, have been put forward solely "to tie up the Escrow Amount in an effort to prevent Mr. Pratt from realizing the full amount of the sale," *id.* ¶ 9, and that he is today entitled to the release of the funds currently held in escrow as a result of Atalian NE's claims, *see id.* ¶¶ 8, 34, 41–47, 59, 79–80. The dispute between Pratt and Atalian NE, as alleged, is clearly an actual controversy within the scope of Article III. *Duane Reade*, 411 F.3d at 388.

Further, entry of a declaratory judgment, should Pratt establish his entitlement to it, would "serve a useful purpose in clarifying the legal issues involved" and "finalize the controversy and offer relief from uncertainty." *Amusement Indus.*, 693 F. Supp. 2d at 311 (quoting *Duane Reade*, 411 F.3d at 389). Based on its indemnification claims, Atalian NE claims entitlement to more money than the parties placed in escrow. *See* Compl. ¶ 6. Pratt disputes those claims and alleges that he is entitled to the release of some or all of the escrowed funds. *Id.* ¶¶ 8, 34, 81. This action presents an effective avenue—indeed, the sole effective avenue—for Pratt to obtain that relief. The SPA provides that any legal dispute "arising out of or based upon [the SPA] or the transactions completed hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case

located in the City of New York and County of New York." SPA § 10.10. Notably, the SPA does not identify any alternative procedure to resolve disputed indemnification claims.[4]

And both the SPA and the Escrow Agreement expressly contemplate the parties' use of litigation, such as Pratt has initiated here, to resolve disputed indemnification claims. Under the SPA, any "Unresolved Indemnification Claims shall be released . . . upon the receipt of a Joint Instruction Letter *or Final Order* (as defined in the Escrow Agreement) in respect of any such Unresolved Indemnification Claim." *Id.* § 8.2(j)(iii) (emphasis added). The Escrow Agreement, in turn, defines "Final Order" as:

> [A] final and nonappealable order of a court of competent jurisdiction (an "Order"), which Order is delivered to Escrow Agent accompanied by a written instruction from Purchaser *or* Seller given to effectuate such Order and confirming that such Order is final, nonappealable and issued by a court of competent jurisdiction.

EA § 1 (emphasis added). Read together, the SPA and Escrow Agreement thus provide two mechanisms that may result in the release of the escrowed funds subject to indemnification claims: (1) if the parties are able to arrive at an agreement, they may direct the release of such funds through a joint letter to the escrow agent; or (2) if the parties are not able to agree, then one

---

[4] In contrast, the SPA puts in place an alternative dispute-resolution mechanism governing other disputes—ones related to certain purchase-price adjustments under section 2.3 of the Agreement. It states that, in the event that Pratt and Atalian NE "fail[ed] to reach an agreement with respect to" those calculations at closing, any "disputed amounts" were to be "submitted for resolution to the office of Grant Thornton LLP" or "an impartial nationally or regionally recognized firm of independent certified public accountants" to resolve the dispute. SPA § 2.3(c)(iii). No such mechanism, however, is contractually identified for indemnification claims. Atalian NE's statement that Pratt has failed to "continue with the indemnification procedures specifically agreed to in the SPA"—which it implies allow it to block disbursement of any escrow funds until it determines that the claim has been resolved pursuant to such procedures—does not logically follow. Atalian NE Mem. at 1; Atalian NE Reply at 1–2; *see Dubov v. Lewis*, No. 18 Civ. 3854 (PAE), 2019 WL 1060652, at *3 (S.D.N.Y. Mar. 6, 2019) ("The intent [of a declaratory judgment] is to allow a party to be free from the whim of its opponent in deciding when to resolve the legal dispute between them." (alteration in original) (quoting *Great Am. Ins. Co.*, 735 F. Supp. at 585)). !!!

or the other may pursue litigation, obtain a judicial order regarding the unresolved claims, and

unilaterally deliver it to the escrow agent.  Pratt's lawsuit, to the extent it seeks declaratory relief,

is therefore appropriate and ripe, and not, as Atalian NE urges, an end-run around any term of

either agreement.  Atalian NE Reply at 1–2; *see* Atalian NE Mem. at 1.  Courts in this District

and in Delaware routinely permit such actions, and often grant the declaratory relief sought.[5]

Atalian NE's sole argument to the contrary—that Pratt's claim for declaratory relief is

duplicative of his contract claim and therefore not viable—is incorrect.  Regardless of whether

Pratt succeeds on his contract claim that Atalian NE's Notice breached the SPA, his declaratory

claim seeks a holding that the indemnification claims asserted therein are meritless, such that

Atalian NE is not entitled to the indemnification it seeks.  That claim could succeed even if

Pratt's claim that the assertion, or manner of assertion, of the indemnification claims was a

breach of the SPA.  Pratt also "seeks, as part of his declaratory judgment claim, relief in the form

---

[5] *See, e.g.*, *Katzman v. Helen of Troy Tex. Corp.*, No. 12 Civ. 4220 (PAE), 2013 WL 325562, at *21 (S.D.N.Y. Jan. 28, 2013) (declaring defendant "is not entitled to withhold escrow funds in order to satisfy" indemnification claims); *Rosen v. Mega Bloks, Inc.*, No. 06 Civ. 3474 (LTS) (GWG), 2009 WL 1392538, at *2 (S.D.N.Y. May 19, 2009) (denying motion to dismiss claim for declaratory judgment that defendant was not entitled to indemnification); *Eastman Kodak Co. v. STWB Inc.*, No. 01 Civ. 5124 (JGK), 2002 WL 31465798, at *19, 21 (S.D.N.Y. Nov. 4, 2002) (issuing declaratory judgment that defendant was not entitled to indemnification); *Axa Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus., Inc.*, 891 F. Supp. 978, 983 (S.D.N.Y. 1995) (granting summary judgment on claim for declaratory judgment that defendant was not entitled to indemnification), *aff'd*, 84 F.3d 622 (2d Cir. 1996); *see also Trainum v. Rockwell Collins, Inc.*, No. 16 Civ. 7005 (JSR), 2017 WL 2377988, at *21 (S.D.N.Y. May 31, 2017) (denying summary judgment as to request for declaratory relief seeking release of escrowed funds subject to indemnification claim), *aff'd*, 765 F. App'x 514 (2d Cir. 2019); *I/Mx Info. Mgmt. Sols., Inc. v. MultiPlan, Inc.*, No. Civ. A. 7786 (VCP), 2013 WL 3322293, at *8 (Del. Ch. June 28, 2013) (denying motion to dismiss claim for declaratory relief that "Defendants do not have an indemnifiable claim"); *Winshall v. Viacom Int'l Inc.*, No. Civ. A. 6074 (CS), 2012 WL 6200271, at *3 (Del. Ch. Dec. 12, 2012) (granting summary judgment on claim seeking declaratory relief that defendant was not entitled to indemnification), *aff'd*, 76 A.3d 808 (Del. 2013); *Bonham v. HBW Holdings, Inc.*, No. Civ. A. 820 (N), 2005 WL 3589419, at *12 (Del. Ch. Dec. 23, 2005) (permitting both claims challenging indemnification notice as a breach of contract and "overarching declaratory judgment claim" to survive motion to dismiss).

of an order requiring the release of funds held in escrow"—relief "which would not necessarily follow even if [Pratt] succeeded" on his "breach of contract claims." *Trainum*, 2017 WL 2377988, at *21.

Finally, Pratt's complaint plausibly pleads facts sufficient to support his claim for declaratory relief. As to the indemnification claim based on an alleged ghost-employee scheme, Platt plausibly alleges that, despite Atalian NE's asserted entitlement to more than $2.1 million in losses arising from such a scheme related to the Taj company, Atalian NE's own March 2020 lawsuit against Taj and Roger Persaud, launched months after it sent the Notice, claims barely 10% of that amount in alleged payments to ghost employees. *Id.* ¶ 47. And, Pratt notes, Atalian NE's lawsuit identifies such payments as occurring only in 2019, long after the execution of the December 2017 SPA. *Id.*

As to the indemnification claim relating to affiliate transactions with Taj, Pratt plausibly alleges that this claim, too, lacks merit. *Id.* ¶¶ 41–45. Section 5.19 of the SPA represented that neither Pratt nor any affiliate of an "officer, director, manager, or equityholder" of one of the Suburban Companies had undisclosed agreements with any of those Companies. SPA § 15.9. The Notice claims that Taj's owner, Dan Persuad, had a brother who worked for Suburban, Roger Persaud, and that Suburban de facto operated Taj. Notice at 2. But, Pratt's Complaint alleges, neither Roger nor Dan Persaud is an "officer, director, manager, or equityholder" of any of the Suburban Companies, and the Notice does not describe any agreement or contract between any person holding such a post and any of the Suburban Companies. Compl. ¶¶ 41–45. To be sure, the Notice describes a cozy relationship between Suburban and Taj, and discovery may reveal more connections between them than the family tie between Roger and Dan Persaud,

including perhaps ones that reveal a breach of a representation by Pratt in the SPA.  But that determination is a fact-intensive one not properly resolved on a motion to dismiss.

Accordingly, the Court denies the motion to dismiss Pratt's declaratory judgment claim.[6]

### b.   Breach of Contract

To plead breach of contract under Delaware law, a plaintiff must show the following: (1) "the existence of the contract"; (2) "the breach of an obligation imposed by that contract"; and (3) "the resultant damage to the plaintiff." *Weyhauser Co. v. Domtar Corp.*, 61 F. Supp. 3d 445, 449 (D. Del. 2014) (quoting *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).  Pratt's Complaint alleges that Atalian NE's conduct with respect to its indemnification claims breached the SPA in four distinct ways: because (1) the form of the Indemnification did not meet the SPA's specifications; (2) Atalian NE improperly refused to disclose documents absent a protective order or confidentiality agreement; (3) Atalian NE failed to send a Joint Instruction Letter; and (4) Atalian NE asserted baseless indemnification claims. The Court finds that none of these states a viable breach of contract claim.  The Notice complied in all material respects with the SPA's requirements, and the Complaint does not plausibly allege that any deviations therefrom caused Pratt material prejudice.  As to the other three theories, Pratt has not alleged facts that would constitute a breach of any SPA term.

### i.   Notice Deficiencies

Pratt alleges that the Notice breached the SPA's procedural requirements in three ways: by (1) failing to adequately describe the basis for the claims; (2) failing to provide information it knew about its damages; and (3) failing to provide prompt notice of the claims.  Atalian NE

---

[6] To be sure, as to some particulars, the Complaint is sparse.  It does not specifically address Atalian NE's indemnification claims relating to union dues or the Suburban Companies' collective bargaining agreements, instead characterizing the claims overall as "baseless."  *See, e.g.*, Compl. ¶ 8.

claims that its Notice complied with these requirements and, even if not, that Pratt did not suffer material prejudice as a result.  On these points, the Court holds with Atalian NE.

As to the first, the Complaint alleges that the Notice lacked details that Atalian NE allegedly knew at the time it sent the Notice, and therefore inadequately described the basis for the claims asserted therein.  *See* Pratt Mem. at 12.  But no provision in the SPA obliged Atalian NE to set forth a description of its claims at any specified level of detail, or to include all such information in its possession at the time.  Rather, section 8.2 merely required an indemnification notice to "describ[e] the claim."  SPA § 8.2(g)(i).  That provision thus differs from those in the cases on which Pratt relies on this point, each of which required a notice to address such claims "in reasonable detail" or with "reasonable specificity."  *See, e.g.*, *Hill v. LW Buyer, LLC*, No. Civ. A. 17-591 (MTZ), 2019 WL 3492165, at *8 (Del. Ch. July 31, 2019) ("contractual language" requiring indemnification notice to set forth claims' "factual basis in reasonable detail" raised factual issues precluding summary judgment); *ChyronHego Corp. v. Wight*, No. Civ. A. 17-548 (SG), 2018 WL 3642132, at *11 (Del. Ch. July 31, 2018) (analysis of the term "'reasonable specificity' depends on the circumstances and the allegations," requiring "a developed record" and precluding dismissal on pleadings); *Winshall*, 2012 WL 6200271, at *3 (in holding notice insufficient, noting agreement's requirement that indemnified party "specify in reasonable detail the amount of the claim and the basis for the claim").  Had the SPA's notice requirement been more demanding, Pratt's theory of deficiency might have gained more traction.  But, measured against the contract here, Atalian NE's multi-page, single-spaced Notice was compliant, as it "describ[ed] the claim[s]" at issue.

Second, for similar reasons, the Notice met the SPA's requirements as to its estimation of damages.  The SPA requires only that a party seeking indemnification for any losses state "the

amount thereof (if known and quantifiable)."  SPA § 8.2(g)(i).  The Notice stated that Atalian

NE was in the process of "investigating these claims and at this time, cannot quantify all of the

losses incurred."  Notice at 3.  Accordingly, it set forth its "non-binding preliminary estimate of

damages, . . . based on its current investigation," which amounted to over $2.1 million.  *Id.*; *see

also id.* at 4–5 (similar).  Thus, the Notice disclaimed Atalian NE's knowledge of the specific

amount at issue, as authorized by the SPA.  *See* SPA § 8.2(g)(i).  The Complaint therefore does

not plausibly plead a breach as to notification of the damages.  Here, too, the cases Pratt cites

turned on contractual language more stringent or distinct from that here.  *See, e.g.*, *Winshall*,

2012 WL 6200271, at *3 n.20 (agreement required party to "specify in reasonable detail the

amount of the claim").  In one, the court's holding depended on the *inapplicability* of a term

similar to the one here—"if then known"—and the *applicability* of a term absent here, requiring

"a reasonably detailed analysis of possible damages."  *Bonham*, 2005 WL 3589419, at *6

(provision imposing obligation to notice damages "only 'if then known'" "differs significantly"

from language in separate provision requiring a "reasonably detailed analysis of possible

damages").  Accordingly, those cases do not assist Pratt.[7]

Last, Pratt's argument that Atalian NE's Notice was invalid because it was sent too late

does not state a viable claim.  *See* Pratt Mem. at 13.  The SPA requires that notice be sent "as

promptly as reasonably possible."  SPA § 8.2(g)(i).  This requirement, therefore, is akin to those

in the cases on which Pratt relies.  *See, e.g.*, *Hill*, 2019 WL 3492165, at *8; *Winshall*, 2012 WL

---

[7] Pratt also alleges that Atalian NE's March 2020 lawsuit regarding the ghost-employee scheme proves that it must have known more details regarding its damages by December 2019, in light of Atalian NE's admission in that case that it "first learned of [the ghost-employee scheme] on July 16, 2019."  Compl. ¶ 47.  But Atalian NE's awareness of the scheme in July 2019 does not imply its knowledge of the extent of potential losses, or that it had learned of the amount of such losses, by December 2019.

6200271, at *3 & n.20; *Bonham*, 2005 WL 3589419, at *6.  And, taking the Complaint's allegations as true and drawing all inferences in favor of Pratt, it plausibly alleges a nearly five-month gap between Atalian NE's learning of certain liabilities relating to the ghost-employee scheme and its Notice to Pratt.  *See* Compl. ¶ 47.  Accordingly, were no other contract terms germane, the reasonableness of the timing of Atalian NE's Notice timing would "depend[] on the circumstances and the allegations," and "involve[] questions of fact" not resolvable at the pleading stage absent a "developed record."  *ChyronHego*, 2018 WL 3642132, at *11.

However, the SPA further requires Pratt to show "material prejudice" arising from the alleged delay.  After setting forth the procedures required to assert an indemnification claim, the SPA states that any deficiency in an indemnification notice "shall not relieve the Indemnifying Party of its obligations hereunder except to the extent such failure shall have materially prejudiced the Indemnifying Party."  SPA § 8.2(g)(i).  Pratt has not plausibly alleged any such prejudice resulting from the timing of Atalian NE's Notice.  *See Project Boat Holdings, LLC v. Bass Pro Grp., LLC*, No. Civ. 12606 (VCS), 2019 WL 2295684, at *24 (Del. Ch. May 29, 2019).[8]  Thus, even assuming that Atalian failed to send the Notice "as promptly as reasonably possible," the Complaint does not plausibly allege that such failure altered Pratt's indemnification obligations.  Accordingly, the Complaint does not state a claim with respect to this alleged defect.

---

[8] The Complaint does generally state that he has been prejudiced.  *See* Compl. ¶ 48 ("Mr. Pratt has been prejudiced by Atalian's delay and failure to comply with its notice obligations under the SPA as detailed above, in that, among other things, he has been forced to expend substantial amounts of time and money attempting to understand the basis for Atalian's improper interference with the release of the Escrow Amounts and bringing this action to enforce his rights.").  But nothing therein ties any such prejudice to the timing of the Notice, or suggests that an earlier notice would have diminished or eliminated such harm.  *Id.*  Nor does Pratt, in his brief opposing dismissal, make any argument to that effect.  *See* Pratt Mem. at 13.

ii.     Failure to Disclose Books and Records

Pratt's allegations related to his access to Atalian NE's books and records also do not

plausibly state a claim.  He alleges that Atalian NE's demand that Pratt enter into a

confidentiality agreement for disclosing such records violated section 8.2(g)(v) of the SPA.  That

provision requires an indemnified party to provide an indemnifying party access to "all books

and records of the Indemnified Party reasonably relating to any Loss."  SPA § 8.2(g)(v).

However, it qualifies that obligation immediately thereafter, stating that "no Indemnified Party

shall be required to make available" such books and records that it "reasonably determines to be

confidential or subject to attorney-client privilege *unless and until* the Indemnifying Party and its

representatives shall have entered into such agreements *as the Indemnified Party reasonably*

*deems necessary in light of all surrounding circumstances*."  *Id.* (emphasis added).  That

provision gave Atalian NE broad discretion over when, and as to which records, any such

agreement would be necessary, as well as the form and contents of such agreement.  Notably,

Pratt does not allege that he ever entered into such agreement before filing this action.  Instead,

he alleges only that the one proposed by Atalian NE "was overly restrictive and unacceptable to

Mr. Pratt."  Compl. ¶ 54.  Whatever Pratt's views are as to the terms offered to him, he has not

pointed to any obligation in the SPA that Atalian NE breached by asking him to enter into it, or

by declining to disclose, in the absence of any agreement, records it had deemed confidential.

Nor has Pratt identified any damages caused solely by that lack of disclosure.

iii.     Failure to Send a Joint Instruction Letter

Pratt's Complaint also alleges that Atalian NE's failure to send a Joint Instruction Letter

to the escrow agent pursuant to section 8.2(j) of the SPA was a breach.  But that claim, too, fails.

Under the SPA, the parties' obligation to send a Joint Instruction Letter depends on whether the

Notice asserts valid claims for indemnification exceeding the $2.1 million escrow amount, and

whether those claims remain unresolved.  Section 8.2(j)(ii) of the SPA requires Atalian NE and Pratt to send a Joint Instruction Letter only "[u]pon resolution of any and all Purchaser Indemnitee claims for indemnification . . . asserted in an Indemnification Notice in accordance with Section 8.2(f)."[9]  And section 8.2(j)(iii) requires that they do so 10 days after the second anniversary of the SPA's closing only if the amount in escrow exceeds "the amount of Purchaser Indemnification Claims asserted in an Indemnification Notice prior to such second anniversary but not yet resolved."  Accordingly, Atalian NE was obliged to send such letter to the escrow agent only in the event that the claims in its Notice were invalidly asserted, already resolved, or less than $2.1 million.[10]  Because the Notice complied with the SPA's procedural requirements, Atalian NE's claims remain unresolved, and the amount of the unresolved claims exceeds $2.1 million, Atalian NE did not have a duty to send a Joint Instruction Letter releasing the escrowed funds.  Accordingly, its failure to do did not breach any SPA provision.

### iv.    Assertion of Meritless Indemnification Claims

Finally, Pratt alleges that Atalian NE's assertion of meritless indemnification claims itself constituted a breach of the SPA.  In moving to dismiss, Atalian NE argues that such a claim is not recognized under Delaware law, and that the SPA authorizes its assertion of indemnification claims, even if these prove meritless.  *See* Atalian NE Mem. at 15–17 (citing *Julius v. Accurus Aerospace Corp.*, No. Civ. A. 17-632 (MTZ), 2019 WL 5681610, at *16 (Del. Ch. Oct. 31, 2019)).

---

[9] It appears that this reference to section 8.2(f) is an error in the SPA, as all specifications relating to indemnification notices, and the definition thereof, are found in section 8.2(g). Section 8.2(f) contains a discrete clarification relating to the effect of certain terms in a different provision of the agreement.  This discrepancy is irrelevant to the instant motions.

[10] In his opposition brief, Pratt seems to concede as much.  *See* Pratt Mem. at 16 (Joint Instruction Letter was required "*because* [Atalian NE] did not provide proper notice of valid indemnification claims or comply with its obligation to provide all books and records reasonably relating to its purported loss." (emphasis added)).

On this point, too, Atalian NE is correct. *Julius* is squarely on point. There, as here, buyers asserted indemnification claims arising out of an asset-purchase agreement, "withholding a portion of the purchase price and refusing to authorize the release of the escrow funds." 2019 WL 5681610, at *16. The sellers sued, alleging that the indemnification claims were "meritless," and the buyers counterclaimed seeking indemnification. *Id.* at *15. At summary judgment, the Chancery Court rejected the buyers' indemnification claims as unsupported by the evidence, and held that sellers were entitled to release of the escrowed funds. *Id.* Even so, the Court held, the *assertion* of those claims pursuant to bargained-for terms "is not evidence of a breach of contract." *Id.* at *16. "Even though Buyers' . . . claim was unsuccessful, Buyers did not breach the APA and Escrow Agreement by pursuing that claim in accordance with bargained-for terms." *Id.*

So, too, here. As discussed, Atalian NE has pursued its indemnification claims in accordance with the SPA, and asserted them timely, before the two-year anniversary of the SPA's closing date. And, as the Court has held, the Complaint does not plausibly allege that Atalian NE's Notice failed in any material respect to comply with the requirements set forth in SPA section 8.2. *See supra* pp. 21–26. Accordingly, as in *Julius*, Pratt is left only with the claim that, although following "negotiated and agreed-upon indemnification procedures," Atalian NE has asserted baseless or meritless claims for indemnification. *Julius*, 2019 WL 5681610, at *16. Under Delaware law, that does not state a breach-of-contract claim.[11] *Id.* Pratt has not cited, and

---

[11] Pratt emphasizes that *Julius* was decided at summary judgment, not on a motion to dismiss. *See* Pratt Mem. at 18–19. Its holding applies nevertheless. There, the court found what Pratt here pleads: that the buyers' indemnification claims lacked merit, and that the seller was entitled to the escrowed amount. *Julius*, 2019 WL 5681610, at *15–16. The different procedural posture of the two cases is of no moment.

the Court has not found, any Delaware cases recognizing liability for breach of contract solely on the basis of a party's assertion of meritless, baseless, or otherwise unsuccessful indemnification claims. *See* Pratt Mem. at 14, 17–19.[12]  The aggrieved party's relief, if any, is to be obtained via a claim for declaratory judgment, as Pratt separately purses here.

Pratt seeks to distinguish *Julius* on the ground that it depended (1) on finding that the relevant notice had complied with the parties' agreement; and (2) was sent in good faith.  Pratt Mem. at 18.  The first argument fails because the Court has held the notice compliant.  As to the second, Pratt is wrong.  *Julius* did not turn on the buyers' good faith, but on their compliance with the objective terms of the parties' agreement.  2019 WL 5681610, at *15–16.  To the extent *Julius* discussed bad faith, it did so in the context of the sellers' separate claim that the buyers had breached the implied covenant of good faith and fair dealing.  *Id.* at *15, *17 (holding that withholding of escrowed funds did not amount to bad faith).  But Pratt has not asserted such a claim here.  Accordingly, *Julius* is on all fours.  It precludes liability for breach of contract on the basis of Atalian NE's assertion of indemnification claims, even if those claims prove meritless.

## 2.      Pratt's Claims Under the Escrow Agreement

The Complaint also does not plausibly plead a violation of the Escrow Agreement.  It alleges two breaches of that Agreement: (1) "Atalian breached the Escrow Agreement by refusing to send a Joint Instruction Letter to the Escrow Agent"; and (2) "Atalian breached the Escrow Agreement by improperly asserting baseless claims for indemnification against Mr. Pratt with the purpose and effect of preventing the disbursement of the Escrow Amount."  Compl. ¶¶ 68–69.

---

[12] Each case cited by Pratt turned on a material deficiency in the indemnification notice, not on the merits of the claims it asserted.  *See, e.g.*, *Bonham*, 2005 WL 3589419, at *6 (discussing only "adequacy of notice").  The Court has rejected Platt's claim of such a deficiency here.

As to the first, the Escrow Agreement does not require Atalian NE to send a Joint Instruction Letter.  It does require that the escrow agent "disburse Escrow Funds . . . upon receipt by the Escrow Agent of . . . a Joint Instruction Letter."  EA § 4(a).  And it sets out the required contents and form of such a letter.  *See id.* §§ 4(a), 6.  But only the SPA, not the Escrow Agreement, requires the parties to send such a letter—and even then, as discussed, only in specific circumstances.  *See* SPA § 8.2(j)(ii) ("Upon resolution of any and all [indemnification claims] . . . , the Seller and the Purchaser shall execute and deliver to the Escrow Agent a Joint Instruction Letter . . . ."); *id.* § 8.2(j)(iii) ("Within ten (10) Business Days after the second anniversary of the Closing, the Seller and the Purchaser shall execute and deliver to the Escrow Agent a Joint Instruction letter instructing the Escrow Agent to release all or a portion of the funds" exceeding the amount of unresolved indemnification claims.).  Absent a contractual provision in the Escrow Agreement requiring Atalian NE to send a Joint Instruction Letter, its failure to do so is not a breach of that agreement.  *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006); *see also Wolff v. Rare Medium, Inc.*, 65 F. App'x 736, 738 (2d Cir. 2003).

Similarly, as to the second theory, the Escrow Agreement does not impose obligations regarding indemnification claims.  To the extent that Agreement discusses indemnification at all, it does so exclusively in the context of indemnification *of the escrow agent*—not Pratt or Atalian NE.  *See, e.g.*, EA §§ 11 ("Indemnification of Escrow Agent"), 12(b) ("Disbursement from Escrow Funds to Pay Escrow Agent").  But it says nothing about the assertion of indemnification claims against buyer Pratt, the "purpose and effect" of such claims, or the manner in which such claims are to be pursued.  Compl. ¶ 69.  Nor does it impose "an obligation not to unreasonably

tie up the escrow and prevent its distribution to Mr. Pratt through a baseless pretextual notice to Escrow Agent," as Pratt argues.  Pratt Mem. at 19.

Unsurprisingly, therefore, Pratt has not identified any specific provision of the Escrow Agreement that Atalian allegedly breached by sending a Notice pursuant to the SPA's terms. Absent the identification of "any express contract provision that was breached" or "any implied contract term" that should be read into the contract, Pratt's claim under the Escrow Agreement "fails to state a claim upon which relief may be granted."  *Wal-Mart Stores*, 901 A.2d at 116; *Shaev v. Adkerson*, No. Civ. A. 10436 (VCN), 2015 WL 5882942, at *4 (Del. Ch. Oct. 5, 2015) (same); *see also Wolff*, 65 F. App'x at 738.

Accordingly, the Court dismisses Pratt's claim under the Escrow Agreement.

### C.      The Guarantors' Motion to Dismiss

On substance, the Guarantors' motion to dismiss tracks Atalian NE's.  But they also raise additional threshold arguments specific to one or both of them.  They challenge Pratt's standing to sue either Atalian Global or La Financiere, Pratt's ability to sue La Financiere under BCL § 1314(b), and the Court's personal jurisdiction over La Financiere.  The Court addresses these preliminary issues first, finding that although Pratt has standing to sue both Guarantors and that the Court has personal jurisdiction over La Financiere, New York law forecloses Pratt's suit against La Financiere.  The Court last addresses the merits of Pratt's breach-of-contract claim only as brought against Atalian Global.

### 1.      Standing

The Guarantors first challenge Pratt's Article III standing to sue them and move to dismiss his claims against them under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction.

"A claim that a party lacks standing to bring suit is an attack on a court's subject matter jurisdiction over that party." *EMI Entm't World, Inc. v. Karen Records, Inc.*, No. 05 Civ. 390 (LAP), 2013 WL 2480212, at *2 (S.D.N.Y. June 10, 2013) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541–42 (1986)).  Constitutional standing thus "is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that jurisdiction exists." *Giammatteo v. Newton*, 452 F. App'x 24, 27 (2d Cir. 2011) (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  Article III standing consists of three "irreducible" elements: (1) injury-in-fact, (2) a causal connection between the injury and the conduct complained of, meaning that "the injury has to be fairly traceable to the challenged action of the defendant"; and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted).  To establish redressability, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560 (citation omitted).  A plaintiff must "demonstrate standing for each claim and form of relief sought." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Baur v. Veneman*, 352 F.3d 625, 642 n.15 (2d Cir. 2003)).

The Guarantors argue primarily that Pratt cannot meet the third element of Article III standing: redressability.  In support, they contend that Pratt seeks only an order directing them to instruct the escrow agent to release funds owed to Pratt, which they lack authority to do because they are not parties to the Escrow Agreement.  But several premises of this argument are faulty.

Under the SPA, the Guarantors "irrevocably, absolutely and unconditionally guarantee[d] to the Seller the due, prompt and punctual payment and *performance* by the Purchaser of all of its respective payment and *performance obligations* under this Agreement, *including any*

*damages payable to the Seller* pursuant to the terms of this Agreement."  SPA § 9.1(a) (emphasis

added).  Among the "performance obligations" listed in the SPA—not the Escrow Agreement—

are Atalian NE's obligations (1) to send a Notice describing any claim for indemnification "as

promptly as reasonably possible," *id.* § 8.2(g)(i); and (2) to "execute and deliver to the Escrow

Agent a Joint Instruction Letter instructing the Escrow Agent to release" any funds exceeding

unresolved claims asserted in a Notice two years and 10 days after the sale of the Suburban

Companies, *id.* § 8.2(j)(ii), (iii).  The SPA provides that the liability of Atalian NE and the

Guarantors "shall be joint and several, and shall to the fullest extent permitted under Applicable

Law, be absolute and unconditional."  *Id.* § 9.1(b).

 First, the Guarantors' claim that they "are not parties to the Escrow Agreement," and

therefore "lack the authority to instruct the Escrow Agent to do anything, including disburse

funds," is misguided.  Guarantors Mem. at 12.  As discussed above—and as Atalian NE has

argued—all obligations with respect to the disbursement of escrowed funds to cover

indemnification claims arise from the SPA, to which the Guarantors *are* parties.  *See* SPA

§ 8.2(j).  That the Guarantors are not parties to the Escrow Agreement has no bearing on their

powers to issue a Joint Instruction Letter or similar directive to the escrow agent, or to cause

Atalian NE to do so, should the Court hold, on Pratt's claim for declaratory relief, that Pratt is

entitled to the escrowed funds.

 Second, to the extent the Guarantors assert an inability to issue instructions to the escrow

agent under the SPA, that argument is at odds with their guarantee.  Pratt's claims include that

Atalian NE was obliged, under SPA section 8.2, to send a compliant Notice and to instruct the

escrow agent to disburse certain funds. *See* Compl. ¶¶ 58–63.[13]  And under the SPA, the Guarantors "irrevocably, absolutely and unconditionally guarantee[d]" Atalian NE's performance of all its obligations under the Agreement, including these, and agreed to be held jointly and severally liable for any failures to do so.  SPA § 9.1(a), (b).  The Guarantors' notion that they lack authority to ensure their subsidiary's (*i.e.*, Atalian NE's) performance of its contractual obligations—such that judicial relief against them would be, as a constitutional matter, ineffective—is therefore contradicted by section 9.1 of the SPA, which obliged them to do just that.  Under the SPA, therefore, an order compelling the Guarantors to assure the disbursement of the escrowed funds (were Pratt to succeed on the merits) would be effective in providing Pratt relief.  That establishes Article III standing. *See Lujan*, 504 U.S. at 560.[14]

Third, the Guarantors' premise that Pratt seeks as to them only an order directing release of the escrowed funds is incorrect.  Pratt's Complaint also seeks—including if the Guarantors cannot release or cause the release of the escrowed funds—"his actual damages."  Compl. at Request for Relief ¶ (d).[15]  And the SPA provides that liability under it "shall be joint and

[13] Although the Court has held *infra* that the Complaint does not plausibly allege a breach of those obligations, that goes to the merits of Pratt's claims, not his standing to bring them.

[14] The cases cited by the Guarantors are far afield and hence of little utility. *See, e.g.*, *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 558–59 (S.D.N.Y. 2018) (in suit challenging being blocked from accessing the @realDonaldTrump Twitter account, plaintiffs lacked standing as to one defendant, who lacked access to the account).

[15] The Guarantors suggest that the only damages Pratt seeks are "byproduct[s] of the suit itself," and therefore non-cognizable under Article III. *See* Guarantors Reply at 2 (quoting *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 109 (2d Cir. 2008)).  But Pratt's request for actual damages goes beyond seeking legal fees—"byproduct" costs that *Huff* and other cases have held cannot support Article III standing. *See* Compl. at Request for Relief ¶¶ (d), (e) (seeking, separately, "actual damages" and "reasonable attorney's fees and costs"); Pratt Mem. at 20 (seeking "monetary damages arising from their breach, *including* attorney's fees" (emphasis added)).  They also include, *inter alia*, "expenses arising out of the investigation

several, and shall to the fullest extent permitted under Applicable Law, be absolute and
unconditional."  SPA § 9.1(b).  Accordingly, Pratt pursues recoverable damages from the
Guarantors and has standing to sue them.

### 2.     La Financiere's Arguments for Dismissal

#### a.     Personal Jurisdiction

The Guarantors make two threshold arguments for dismissal unique to La Financiere.
First, La Financiere alone challenges the Court's personal jurisdiction over it.  Pratt responds that
the Court has personal jurisdiction over La Financiere pursuant to a forum-selection clause in the
SPA.  Pratt is correct on this point.  "Parties can consent to personal jurisdiction through forum-
selection clauses in contractual agreements." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103
(2d Cir. 2006).[16]  Where a forum-selection clause (1) was "reasonably communicated to the
resisting party"; (2) "is mandatory"; and (3) "encompasses the claims and parties at issue," there
is a presumption that such a clause is valid and enforceable.  *Martinez v. Bloomberg LP*, 740 F.3d
211, 227 (2d Cir. 2014).  That presumption can then only be overcome by a showing that
enforcement of the clause would be "unreasonable or unjust." *Id.* (quoting *Phillips v. Audio
Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007)).  And "[w]hen a forum selection clause is found
valid and enforceable, 'it is not necessary to analyze jurisdiction under New York's long-arm
statute or federal constitutional requirements of due process.'"  *Am. S.S. Owners Mut. Prot. &*

---

of Atalian's baseless claims."  Pratt Mem. at 17; *see Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83, 107–08 (1998) ("'[I]nvestigation costs' . . . incurred prior to the litigation, in digging
up the emissions and storage information that petitioner should have filed, and that respondent
needed for its own purposes[,] . . . would assuredly support Article III standing," but such costs
were irrelevant since plaintiffs were statutorily limited to recovering "costs of litigation").

[16] La Financiere states, and Pratt does not dispute, that it is a French limited joint stock company
formed under French law with its only place of business located in Paris, France.  Guarantors
Mem. at 2–3.  No party asserts that the Court has personal jurisdiction over La Financiere other
than through the SPA's forum-selection clause.

*Indem. Ass'n v. Am. Boat Co.*, No. 11 Civ. 6804 (PAE), 2012 WL 527209, at *2 (S.D.N.Y.

Feb. 17, 2012) (quoting *Exp.-Imp. Bank of the U.S. v. Hi-Films S.A. de C.V.*, No. 09 Civ. 3573

(PGG), 2010 WL 3743826, at *4 (S.D.N.Y. Sept. 24, 2010)).

Here, the SPA—the only agreement to which La Financiere is a party—contains an

express forum-selection clause.  *See* SPA § 10.10(a) ("Submission to Jurisdiction; Choice of

Forum").  It reads:

> Except as otherwise provided herein, any legal suit, action or proceeding arising
> out of or based upon this agreement or the transactions contemplated hereby may
> be instituted in the federal courts of the United States of America . . . in each case
> located in the City of New York and County of New York.  And each party
> *irrevocably submits to the exclusive jurisdiction of such courts* in any such suit,
> action or proceeding.

*Id.* (emphasis added).  La Financiere expressly agreed to be bound by that clause in section 9.1,

*i.e.*, the guarantee provision.  *See* SPA § 9.1(d) (agreeing "that for all purposes of the Atalian

Guaranty, the provisions of Section 10.10 and 10.12 shall be binding upon it and shall apply to it

as fully and effectively as if [La Financiere] were a named party to this Agreement").

La Financiere concedes that the forum-selection clause was communicated to it.

Guarantors Mem. at 13.  It disputes, however, whether the clause is mandatory and whether it

encompasses the claims and parties at issue.  *Id.*  Those arguments are easily dispatched.  First,

La Financiere argues that the clause is permissive, not mandatory, because it states that lawsuits

"may be instituted" in courts in New York City.  *Id.* at 14.  But that ignores the next sentence of

the clause, which states that "each party irrevocably submits to the exclusive jurisdiction of such

courts in any such suit, action or proceeding."  SPA § 10.10(a).  Such language is the hallmark of

a mandatory forum-selection clause.  *See, e.g.*, *S.K.I. Beer Corp. v. Baltika Brewery*, 612 F.3d

705, 708 (2d Cir. 2010) ("A forum selection clause is viewed as mandatory when it confers

exclusive jurisdiction on the designated forum . . . ." (quoting *Phillips*, 494 F.3d at 386));

*CleanSpark, Inc. v. Discover Growth Fund, LLC*, No. 20 Civ. 6164 (JSR), 2020 WL 5406174, at \*5–6 (S.D.N.Y. Sept. 9, 2020) (noting that parties did not dispute that essentially identical clause was mandatory); *RECAP Invs. XI-Fund A, L.P. v. McCullough Harris, LLC*, 760 F. Supp. 2d 368, 370 (S.D.N.Y. 2010); *Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992 A.2d 1239, 1241 (Del. Ch. 2010).

Second, La Financiere argues that the SPA's forum-selection clause is unenforceable because it does not cover "escrow-related claims." Instead, it argues, those claims are controlled by the Escrow Agreement, which has a separate forum-selection clause that mandates litigation in Delaware. Guarantors Mem. at 14–15; EA § 17. But the Escrow Agreement's forum-selection clause applies only to "the parties hereto," and La Financiere is not a party to the Escrow Agreement. *See* EA § 17; *id.* at 1; Guarantors Mem. at 12 ("La Financiere and Global Services are not parties to the Escrow Agreement . . . ."). Further, Pratt's claims against La Financiere arise out of the SPA and its indemnification provisions, not the Escrow Agreement. *See* Compl. ¶¶ 71–76 (Count III brings claims against La Financiere only arising from the SPA's guarantee provision).[17] Accordingly, these claims do not "aris[e] out of" or "relat[e] [to]" the Escrow Agreement so as to be covered by its forum-selection clause. The forum-selection clause in the SPA, not in the Escrow Agreement, thus governs Pratt's claim against La Financiere.

The SPA's forum-selection clause was reasonably communicated to La Financiere, is mandatory, and covers the relevant dispute. Accordingly, it is presumptively enforceable against La Financiere. And La Financiere has not argued that its application to it would be unreasonable or unjust. The Court thus finds that it has personal jurisdiction over La Financiere.

---

[17] Atalian NE did not argue that the Escrow Agreement's forum-selection clause barred Pratt's claim against it under that agreement, which the Court has dismissed on the merits.

b.    *New York Business Corporations Law § 1314(b)*

The Court's ability to adjudicate Pratt's claims against La Financiere is, however, barred by New York law.  New York BCL § 1314(b) bars actions in New York courts brought by non-residents of New York against foreign corporations unless one of five exceptions applies.  BCL § 1314(b) ("Except as otherwise provided in this article, an action or special proceeding against a foreign corporation may be maintained by another foreign corporation of any type or kind or by a non-resident in the following cases only . . . .").[18]  The weight of authority suggests that federal courts sitting in diversity must adhere to this rule even when applying another state's substantive law.  *See, e.g.*, *Woods v. Interstate Realty Co.*, 337 U.S. 535, 538 (1949); *Dan-Bunkering (Am.), Inc. v. Tecnologias Relacionadas con Energia y Servicios Especializados, S.A. de C.V.*, No. 17 Civ. 9873 (KPF), 2019 WL 1877344, at *4 n.3 (S.D.N.Y. Apr. 26, 2019) (noting mandatory nature of "New York 'door closing' statutes," including section 1314(b), in context of diversity action by Texas corporation against Mexican companies); *Calzaturificio Giuseppe Garbuio S.A.S. v. Dartmouth Outdoor Sports, Inc.*, 435 F. Supp. 1209, 1210 (S.D.N.Y. 1977) ("We conclude that the attachment must be vacated, even if it is otherwise proper and valid, because the action is barred by [N.Y. Bus. Corp. L. § 1314(b)], a statute which must be applied by a federal court sitting in diversity.").

---

[18] Those are that: (1) the action is brought to recover damages arising from the breach of a contract made or to be performed in New York; (2) the subject matter of the litigation is within New York; (3) the cause of action arose within New York; (4) the non-domiciliary would be subject to personal jurisdiction under C.P.L.R. § 302; and (5) the defendant is a foreign entity doing business or authorized to do business in New York.  BCL § 1314(b)(1)–(5).  Pratt does not argue that any of those exceptions applies here.  There is no evidence that the SPA was made or performed in New York.  And although consent can form the basis for personal jurisdiction under New York law under C.P.L.R. § 301, New York "does not recognize consent as a basis for long-arm jurisdiction" under C.P.L.R. § 302.  *Techo-TM, LLC v. Fireaway, Inc.*, 123 A.D.3d 610, 610 (1st Dep't 2014).

Pratt does not dispute that this statute applies to this case, or that any exception in section 1314(b) applies.  Rather, he relies on another statutory exception to this rule, found in New York General Obligations Law ("GOL") § 5-1402(1).  Under it:

> Notwithstanding . . . paragraph (b) of section [1314] . . . , any person may maintain an action or proceeding against a foreign corporation, non-resident, or foreign state where the action or proceeding arises out of or relates to any contract, agreement or undertaking *for which a choice of New York law has been made in whole or in part* pursuant to section 5-1401 and which (a) is a contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate, not less than one million dollars, and (b) which contains a provision or provisions whereby such foreign corporation or non-resident agrees to submit to the jurisdiction of the courts of this state.

GOL § 5-1402(1) (emphasis added).  Pratt argues that this exception applies because the SPA was worth more than $1 million and La Financiere agreed to submit to the jurisdiction of the courts of New York through the forum-selection clause therein.  Pratt Mem. at 23.

As the Guarantors note, however, that fulfills only two of the three elements necessary for section 5-1402 to overcome section 1314(b).[19]  In addition, the SPA must have a choice-of-law provision selecting New York law in whole or in part.  *See DDR Real Estate*, 769 N.Y.S.2d at 836 (dismissing case where contract had a forum-selection clause requiring New York forum, concerned over $1 million, but selected Maryland law to apply); *id.* at 835 ("These statutes implement the public policy that favors New York courts retaining and determining lawsuits *where New York law is applicable to the dispute pursuant to the agreement of the parties and* New York is the designated forum." (emphasis added)).  Here, as noted, the SPA elects

---

[19] "In order for a choice of forum to be effective under § 1402 the statutory requirements are: 1) there must be an agreement 'for which a choice of New York law has been made in whole or in part pursuant to section 5-1401' and 2) the agreement must involve an obligation arising out of a transaction covering not less than one million dollars and 3) the agreement must contain a clause whereby the foreign corporation or non-resident agrees to submit to the jurisdiction of the courts of New York State."  *DDR Real Estate Servs., Inc. v. Burnham Pac. Props., Inc.*, 769 N.Y.S.2d 832, 836 (Sup. Ct. 2003), *aff'd*, 12 A.D.3d 1182 (4th Dep't 2004).

Delaware, not New York, law.  Accordingly, GOL § 5-1402 does not avail Pratt and BCL § 1314(b) bars his claims against La Financiere.  The Court therefore must dismiss La Financiere from this action.

### 3.    Merits

On the merits, the Guarantor's motion to dismiss is entirely derivative of Atalian NE's motion:  Its sole argument in favor of dismissal is that Pratt has failed to state a claim against Atalian NE, such that there is no plausibly pled claim or loss for which they can be liable.  *See* Guarantors Mem. at 10.  But as discussed above, the Complaint pleads a viable claim for declaratory relief against Atalian NE.  Because the Guarantors "irrevocably, absolutely and unconditionally guarantee[d]" Atalian NE's performance of all its obligations under the Agreement, and agreed to be held jointly and severally liable for any failure to do so, Pratt also has plausibly alleged that Atalian Global is responsible for Atalian NE's failure to release the funds currently held in escrow.  SPA §§ 9.1(a), (b).  Accordingly, the Guarantor's motion to dismiss is denied as to Atalian Global.

### CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the motions to dismiss by both Atalian NE and the Guarantors.  As to Atalian NE, the Court grants the motion to dismiss the Complaint's claims for breach of the SPA and of the Escrow Agreement, and otherwise denies the motion.  As to the Guarantors, the Court dismisses the claims against La Financiere, which is dismissed from this action, but otherwise denies the motion.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 22 and 23.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: November 30, 2020
       New York, New York